**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA – EASTERN DIVISION**

DANNY A. N.,[1]

        Plaintiff,

   v.

FRANK BISIGNANO, Commissioner
of Social Security,[2]

        Defendant.

Case No. EDCV 25-00576-AS

**MEMORANDUM OPINION**

**AND ORDER OF REMAND**

    For the reasons discussed below, IT IS HEREBY ORDERED that, pursuant to Sentence Four of 42 U.S.C. § 405(g), this matter is remanded for further administrative action consistent with this Opinion.

---

[1] Plaintiff's name is partly redacted in accordance with Federal Rule of Civil Procedure 5.2(c)(2)(B) and the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States.

[2] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Frank Bisignano, Commissioner of Social Security, is hereby substituted as the Defendant in this action.

1

**PROCEEDINGS**

On March 5, 2025, Plaintiff filed a Complaint seeking review of the Commissioner's denial of Plaintiff's applications for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act, respectively. (Dkt. No. 1). On May 5, 2025, Defendant filed an Answer consisting of the Administrative Record ("AR"). (Dkt. No. 10). The parties subsequently filed opposing briefs setting forth their respective positions regarding Plaintiff's claims ("Pl. Brief," "Def. Brief," and "Pl. Reply"). (Dkt Nos. 11-13). The parties have consented to proceed before a United States Magistrate Judge. (Dkt. Nos. 6, 8).

The Court has taken this matter under submission without oral argument. See C.D. Cal. C. R. 7-15.

**BACKGROUND AND SUMMARY OF ADMINISTRATIVE DECISION**

On or about April 1, 2022, Plaintiff filed applications for disability insurance benefits and supplemental security income alleging disability since June 5, 2018, (AR 17, 253-62), alleging disability based on a back injury, diabetes, depression, vertigo, high blood pressure, and neuropathy. (AR 276).

Plaintiff's applications were denied, initially on September 22, 2022, and on reconsideration on March 2, 2023. (AR 142-46, 149-54). On December 1, 2023, Plaintiff, who was represented by counsel, testified at a video hearing before Administrative Law

Judge ("ALJ") MaryAnn Lundeman. (AR 35-59). The ALJ also heard testimony from vocational expert ("VE") Tracy Remas. (AR 53-58). On April 12, 2024, the ALJ denied Plaintiff's applications. (AR 17-29).

The ALJ applied the requisite five-step process to evaluate Plaintiff's case. (AR 18-28). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the June 5, 2018, alleged onset date. (AR 19). At step two, the ALJ found that Plaintiff has the following severe impairments: cervical degenerative disc disease, diabetes, neuropathy, and vertigo. (AR 20-22). At step three, the ALJ determined that Plaintiff's impairments did not meet or equal a listing found in 20 C.F.R. Part 404, Subpart P, Appendix 1. (AR 22-23).

Next the ALJ found the Plaintiff has a residual functional capacity ("RFC")[3] for light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), limited to: (1) occasional postural activities (i.e., balancing, stooping, kneeling, crouching, and crawling); and (2) no climbing ladders, ropes, or scaffolds, or working on uneven terrain or at or around unprotected heights and hazards, such as moving machinery. See AR 23-26 (adopting a functional capacity more restrictive than the consultative examiners and state agency physicians found, and finding these medical opinions were "somewhat persuasive"). The ALJ rejected ALJ Plaintiff's testimony and statements suggesting greater limits than

---

[3]    A residual functional capacity is what a claimant can still do despite existing exertional and nonexertional limitations. See 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

1   the ALJ found to exist. (AR 23-26).

2

3       At step four, the ALJ found that Plaintiff was unable to

4   perform any past relevant work. (AR 26). At step five, based on

5   Plaintiff's age, education, work experience, RFC, and the VE's

6   testimony, the ALJ determined that Plaintiff could perform certain

7   light and sedentary jobs. (AR 27-28 (adopting VE's testimony at AR

8   54-58)). The ALJ concluded that Plaintiff had not been disabled

9   since the June 5, 2018, alleged onset date. (AR 28).

10

11      On January 27, 2025, the Appeals Council denied Plaintiff's

12  request to review the ALJ's decision. (AR 1-3). Plaintiff now seeks

13  judicial review of the ALJ's decision, which stands as the final

14  decision of the Commissioner. See 42 U.S.C. § 405(g).

15

16                        **STANDARD OF REVIEW**

17

18      This Court reviews the Commissioner's decision to determine

19  if it is free of legal error and supported by substantial evidence.

20  See Brewes v. Comm'r, 682 F.3d 1157, 1161 (9th Cir. 2012).

21  "Substantial evidence" is more than a mere scintilla, but less than

22  a preponderance. Garrison v. Colvin, 759 F.3d 995, 1009 (9th Cir.

23  2014). "It means such relevant evidence as a reasonable mind might

24  accept as adequate to support a conclusion." Revels v. Berryhill,

25  874 F.3d 648, 654 (9th Cir. 2017) (citation and internal quotation

26  omitted).

27

28

                              4

To determine whether substantial evidence supports a finding, "a court must consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion." Aukland v. Massanari, 257 F.3d 1033, 1035 (9th Cir. 2001) (internal quotation omitted). As a result, "[i]f the evidence can support either affirming or reversing the ALJ's conclusion, [a court] may not substitute [its] judgment for that of the ALJ." Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006).

**DISCUSSION**

Plaintiff contends in part that the ALJ failed to provide adequate reasons for rejecting his testimony and statements regarding his physical limitations. (Pl. Brief at 2-10; Pl. Reply at 1-5). After consideration of the record as a whole, the Court agrees. Remand for further consideration of Plaintiff's testimony and statements is warranted.

**A.    Summary of the Relevant Medical Record**[4]

The available treatment record dates back to the alleged onset date and consists mostly of primary care treatment notes, some specialist consultations, a hospital stay for treatment following

---

[4]    Because Plaintiff challenges only the ALJ's consideration of his testimony and statements concerning his physical impairments, the Court summarizes the medical evidence and Plaintiff's testimony and statements concerning Plaintiff's physical impairments.

a car accident in 2019, and monthly pain management treatment after the accident. The Court summarizes each below.

**1.    Primary Care, Specialist, and Hospital Treatment Notes**

On June 4, 2018, Plaintiff saw a doctor at Kaiser Permanente to discuss disability and was advised to see his primary care doctor. (AR 379). The next day Plaintiff saw his primary care doctor complaining of numbness in his feet and ongoing moderate to severe hand cramps and numbness which was worsening for the past two months. (AR 380). He told his doctor that he was not sure if he was taking his medications right—his hemoglobin A1c was up. (Id.). He had foot or leg pain which is a symptom of hyperglycemia. (AR 383). Plaintiff asked to be off work. (AR 380).

The limited physical examination at the time noted no abnormalities. (AR 380-81). Plaintiff was assessed with obesity and diabetes with peripheral neuropathy which would be treated with Hydrocodone-Acetaminophen (Norco) and lifestyle modifications, he was to work with a diabetic educator, and he was given a temporary off work order for two weeks. (AR 381). His diabetic management plan was to not go more than five hours between meals, check his blood sugar four times a day, and report back with his readings for possible medication adjustment. (AR 383).[5] Plaintiff stated

---

[5]    Plaintiff did not follow this plan. He reported blood sugar readings the next week for mostly one or two checks per day. (A.R. 384). He did not respond to follow up requests for two diabetic check-ins. (AR 387-89).

that he could not eat while working, it was not possible, and declined suggestions for how to manage his eating. (Id.).

In August 2018, Plaintiff saw a new primary care doctor. (AR 389). He reported tingling in both legs for years. (AR 390). On examination, he had moderate monofilament sensory loss. (Id.). He was noncompliant with his medication regimen. (AR 392). His doctor explained the risks of uncontrolled diabetes and ordered a diabetic foot examination and hemoglobin A1c monitoring. (Id.).

The next reported visit is in May 2019,[6] when Plaintiff requested medication refills including Norco. (AR 392-93). It was noted that he was exercising 300 minutes per week at a moderate to strenuous level, (AR 393), and noncompliant with his medication regimen. (AR 394). Plaintiff's physical examination was normal, and Plaintiff refused to have a diabetic case manager consultation for his uncontrolled hemoglobin A1c. (Id.). His provider ordered hemoglobin A1c monitoring and told Plaintiff to make an appointment with his primary care doctor. (AR 394-95).

Plaintiff returned in July 2019, complaining of right wrist pain from accidentally striking his wrist against metal four days earlier for which he was given a Toradol injection. (AR 395-96). He had no tenderness and full sensation/range of motion. (AR 395).

---

[6]    During a visit in October 2019, Plaintiff explained that he treated at Kaiser Permanente a year earlier and had no medical insurance then. (AR 716).

Plaintiff was hospitalized in August 2019, after having a roll over car accident in which his car caught fire. (AR 399-452, 457-550, 555-91). Plaintiff had multiple right rib fractures, thoracic spine transverse process fractures, a pneumothorax and small effusion in his lungs, a nasal bone fracture, a zygomatic arch fracture, and some contusions, lacerations, abrasions, and second degree burns to his right upper arm, left shoulder, and right lower leg. (AR 400, 411-13, 418-20, 458, 464, 473). It was noted that he was intoxicated, his blood glucose was 578 consistent with diabetic ketoacidosis with hyperkalemia, and he had been noncompliant with his home insulin medication. (AR 461-62, 464, 473). An internal medicine consultation reported normal gait and speech, and 5/5 strength in his extremities. (AR 556). Occupational therapy testing during his hospital stay showed grip strength of 4/5 in both hands. (AR 547), and noted to have a normal gait without an assistive device during physical therapy. (AR 545). After two weeks, Plaintiff was discharged in stable condition, ambulating, tolerating his diet, eager to go home, and able to resume normal activity. (AR 471). It was noted that would need a shower chair for safety at home, but it is not apparent that Plaintiff was discharged with a cane or other assistive device. (AR 470-72, 545, 548).

In September 2019, Plaintiff requested pain medication for low back and right-sided rib pain from his car accident. (AR 634). He had been discharged from the hospital after the accident with no pain medication. (AR 634). He was then ambulatory with no mention of a cane. (AR 634-35). Later in September, Plaintiff went to the

hospital for a right foot ulcer and was again noted to be ambulatory with no mention of a cane. (AR 631-33).

Plaintiff began seeing primary care doctor, Dr. Hemanshu Patel, in October 2019. (AR 716). Plaintiff reported that he had been in a car accident and that no "etoh" (alcohol) was involved as he remembered, but he did not remember the accident. (AR 716). Although he had diabetes since age 17, he admitted that he did not check his blood sugars. (Id.). Plaintiff was using a cane, limping, and had a slow, cautious, and stiff gait. (AR 717). He had thoracic tenderness on examination. (Id.). Dr. Patel diagnosed rib fractures and uncontrolled diabetes, and prescribed Lidocaine patches, Mobic, and Acetaminophen. (AR 718).

Later, in October 2019, a physical therapist messaged Dr. Patel requesting a hospital bed, standard wheelchair, and a pain management referral for Plaintiff. (AR 664).[7] Plaintiff had complained of severe pain and had difficulty moving from sitting to standing or from supine to sitting. (AR 665). Plaintiff reported severe guarding and severe pain to mild palpation. (AR 666). He was nervous about movement, not yet ready for physical therapy, and it was noted that he might require additional time for healing his injuries. (AR 665-66). His gait was guarded secondary to pain, and he was using a cane. (AR 668).

---

[7]    As detailed below, Plaintiff underwent monthly pain management treatments after his initial pain management evaluation in November 2019. (AR 935).

In November 2019, Plaintiff went to the hospital complaining of dizziness and stayed overnight for evaluation. (AR 598, 601). He reported that he had been more active recently and was experiencing positional dizziness for 5-10 seconds upon standing or turning in bed. (AR 611). At the time, his gait was abnormal, and he required the use of a cane. (AR 602). His dizziness resolved with Meclizine. (AR 598). He was discharged in stable condition with stable gait, intact sensation and 5/5 strength in his extremities, (AR 598, 613-14), with likely positional dizziness due to post-concussion syndrome and chronic low back pain since his car accident. (AR 599, 615). He had no activity restrictions, and his "functional status" reported no assistive devices. (AR 731).

Plaintiff followed up with Dr. Patel's physician's assistant after his hospital visit, complaining of uncontrolled pain everywhere due to healing fractures from his car accident. (AR 712). He reported that he was unable to work, used a wheelchair most of the time, had to move in with his mother after his accident, and needed transportation assistance. (Id.). He was using a wheelchair at the appointment. (AR 713). He had not received diabetes supplies to test his blood sugar, had hypertension when he was discharged from the hospital, and reported continued dizziness. (AR 714). Plaintiff was referred to neurology, cardiology, and given an order for a blood pressure machine, glucometer and testing supplies, home health, and transportation assistance. (Id.).

In January 2020, Plaintiff had a cardiology consultation with a nurse practitioner. (AR 695). He complained of nausea, dizziness, and imbalance issues, shoulder pain and weakness making him unable to lift objects, and was observed to have an unsteady gait for which he needed a cane. (AR 695-96). He had decreased range of motion in his neck and shoulders and mid and upper back pain. (AR 696). The nurse practitioner ordered shoulder MRIs, approval for a head trauma program for concussion syndrome, referred Plaintiff for occupational therapy, and sought approval for a wheelchair rack for Plaintiff's car. (Id.). Plaintiff's partner was told to inquire about getting in-home health authorization for her to care for Plaintiff. (Id.).

In March 2020, Plaintiff underwent a neurology consultation for his dizziness. (AR 724). Plaintiff reportedly had slow mentation and stuttering, was unable to lift his upper extremities above shoulder level, had 3/5 strength in his upper extremities, was using a cane for ambulation, and it was noted that he was unsteady and at risk for falling down. (AR 724-25). Shoulder MRIs showed labral tears, tendinosis, and mild to moderate acromioclavicular joint arthropathy in both shoulders, and bursitis in the right shoulder. (AR 724). The neurologist diagnosed memory loss, posttraumatic headache, a tear of the left supraspinatus tendon, and right shoulder labral tear, ordered a brain MRI and EEG, and referred Plaintiff to an orthopedic surgeon. (AR 724-25). The brain MRI showed signal abnormality in the frontal white matter, and it is noted that Plaintiff's chronic balance problems

resulting in falls and gait abnormalities were from a combination of his head injury and local trauma. (AR 1203).[8]

Later, in March 2020, Plaintiff followed up with Dr. Patel to discuss his consultations. (AR 708). It was noted that he had been non-adherent to most medical recommendations. (Id.). Plaintiff complained of severe vertigo with nausea, ongoing weakness in his hands causing him to be unable to get a proper grip and to drop things easily, and difficulty forming sentences to express what he is thinking. (Id.). He reported having a hard time using pen needles for insulin, was upset about his diabetes status, and indicated his neuropathy was starting to flare and cause significant pain. (Id.). He stated that was no longer was drinking alcohol and was unable to hold a job. (Id.). On examination, Plaintiff was using a wheelchair and was stiff and unsteady, he had decreased range of motion and tenderness in his neck, his hand strength was 4/5, he had thoracic tenderness, and he was angry and agitated. (AR 709). Dr. Patel diagnosed post syncope injury possibly related to a concussion, an "obvious" balance disorder, uncontrolled diabetes

---

[8]    It is not clear if Plaintiff ever had an EEG study. The only orthopedic visit in the record is from July 2021, when Plaintiff presented to an orthopedist complaining of right arm pain and numbness following a recent fall. (AR 1010). He reported balance issues, was unemployed, and felt deconditioned and unable to do his activities of daily living. (AR 1010). On examination, he had positive O'Brien and speed tests, limited range of motion and strength of 3/5 abduction and 4/5 flexion. (AR 1010). A MRI showed a labral tear. (AR 1010). The orthopedist ordered physical therapy, noting that surgery would be considered if Plaintiff's condition did not improve. (AR 1009, 1011). When Plaintiff followed up in September 2021, it was noted that he also had cervicalgia. (AR 1006). There appear to be no treatment notes for any physical therapy for Plaintiff's shoulders.

with neuropathy, and alcoholism in remission, and prescribed Gabapentin for the neuropathy. (AR 710).

In May 2020, Plaintiff followed up complaining of depression and memory problems for which Dr. Patel prescribed Amitriptyline. (AR 994). It was noted that Plaintiff was not completing labs for his diabetes as instructed. (Id.). In August 2020, Plaintiff returned for diabetic foot care. (AR 986-87, 991-92). At another visit in August 2020, Plaintiff reported no improvement in his walking which was not straight because he felt like the room was spinning, agitation, frustration, and worsening memory issues. (AR 988). He had a gait and station with normal posture but was using an assistive device and was unsteady. (AR 989).

In July 2021, Plaintiff reported that his balance and thinking had only slightly improved since his last visit, and he recently had a fall and injured his left shoulder. (AR 973). He had a gait and station with normal posture but was using an assistive device and had a slow, cautious, stiff, and unsteady gait. (AR 975).

In February 2022, Plaintiff complained of right arm numbness and weakness from a herniated disc in his neck. (AR 965). He had a gait and station with normal posture but it was noted that he was using an assistive device, with a slow, cautious, stiff and unsteady gait. (AR 966). Dr. Patel prescribed Mobic for bursitis, Wellbutrin for depression, and discussed taking fall precautions due to recent falls. (AR 967).

Diabetes management visits in March and June 2022, noted that Plaintiff's diabetes continued to be uncontrolled. (AR 956-64). The next note, from April 2023, reported a telephone visit during which Plaintiff complained of shortness of breath, snoring, and fatigue for the last seven months, and back and neck pain. (AR 1157). He was prescribed Albuterol, referred to pulmonology, and told to follow up with his primary care doctor in a week. (AR 1158).

In June, August, and November 2023, and in February 2024, Plaintiff followed up to discuss lab results, and his diabetes remained uncontrolled. (AR 1148-55, 1174-77, 1179-81). At the June 2023 visit, he reported normal gait, station, and posture, and was not using an assistive device. (AR 1154). At the November 2023 visit, his diabetes remained uncontrolled but it was noted that he was "doing so much better" with "big improvement" and had changed his diet. (AR 1180). At the February 2024 visit, he reported that he has pain and tingling in this hands from neuropathy when he "tries to grab a sup or drive." (AR 1174).[9]

**2.    Pain Management**

Plaintiff saw a pain management doctor monthly from November 2019, through at least September 2023, for mid-back and chest wall pain from his multiple rib and thoracic spine fractures, lumbar

---

[9]    It is not clear whether the reference to "sup" refers to a stand up paddle for paddleboarding or something else. (AR 1174).

and cervical radiculopathy, cervical myelopathy, and shoulder pain. (AR 746-946, 1043-1132). At his initial evaluation in November 2019, Plaintiff reported that his pain severely limited his functioning. (AR 935). On examination, he was able to transition from seated to standing position and to the examination table with mild to moderate difficulty, he had tenderness in his ribs, decreased range of motion and tenderness to the thoracic spine, 5/5 strength in all extremities and intact sensation, and his gait was antalgic with no mention of an assistive device. (AR 937-38). His doctor prescribed Norco three times a day. (AR 939).

In December 2019, Plaintiff reported 50 percent benefit from Norco, but that each pill only lasted about four hours. (AR 929). He was able to perform activities of daily living including preparing meals with the assistance of his medication. (Id.). His examination findings were the same as the prior visit. (AR 931). Plaintiff's Norco was increased to four times a day. (AR 933).

In January 2020, Plaintiff complained of bilateral shoulder pain and reported 50 percent benefit from taking Norco. (AR 923). His examination findings were unchanged. (AR 925). His doctor continued Plaintiff's Norco, prescribed Naloxone nasal spray, and ordered bilateral shoulder MRIs. (AR 926-27; see also AR 913-16 (MRI studies showing tendinosis, labral tears, mild osteoarthritis, mild to moderate acromioclavicular joint arthropathy, and right partial tearing of tendons)).

In February 2020, Plaintiff reported that his pain was worse
after a fall earlier that month, he was having more falls and was
seeing a neurologist who wanted Plaintiff to use his wheelchair
more often. (AR 917). He was walking with a cane at his visit.
(Id.). He reported 30-40 percent benefit from taking Norco. (Id.).
His examination findings were unchanged from prior visits except
for the notation that he was using a cane and reported using a
wheelchair in the community. (AR 919). His Norco was continued.
(AR 921).

In March 2020, Plaintiff reported 50 percent benefit from
taking Norco. (AR 908). He reported that he was still able to
perform activities of daily living with his medications. (Id.).
Examination findings were unchanged from the prior visit with a
note that he then was using a cane. (AR 910). His Norco was
continued. (AR 911).

Subsequent appointments were by telephone due to the Covid-19
pandemic. At monthly appointments from April 2020, until September
2023, Plaintiff's Norco was continued, and he also was given trials
of Medrol for increasing back pain twice, and Narcan spray. (AR
746-907, 1043-1132). In December 2020, Plaintiff reported
improvement in his range of motion and  activities of daily living
with his medication regimen without side effects, and mild
limitation in functioning due to pain. (AR 857). In January,
February, March, April, May, and June 2021, Plaintiff continued to
report pain relief and functional improvement. (AR 824, 830, 835,
841, 844, 847, 852). In July 2021, he reported "significant relief"

in pain symptoms and increased activity level, despite a recent
fall due to vertigo. (AR 818; but see AR 815-16 (noting his pain
was moderate to severe with his current regimen but relieved
significantly to 7/10); AR 810, 813 (August 2021 note reporting
significant relief and increased activity but that Plaintiff's pain
had gotten much worse in the past month); AR 802, 807 (September
and October 2021 notes reporting Plaintiff had significant relief
from symptoms and increased activity)). In May 2022, it was noted
that Plaintiff "display[ed]" improvement in his activities of daily
living. (AR 747). In August, September, and October 2022, Plaintiff
was reported to be functional and independent with activities of
daily living with pain medication. (AR 1097, 1105, 1113). The
October 2022 note reported that Plaintiff uses a cane for
ambulation. (AR 1098). His doctor requested an EMG for Plaintiff's
lower extremity weakness and a history of falls. (AR 1098). The
EMG study reportedly showed diabetic neuropathy. (AR 980). At
Plaintiff's appointments in December 2022, and February and April
2023, Plaintiff reported that he was doing well with his
medications and was able to perform his activities of daily living.
(AR 1070-71, 1077-78, 1092).

### 3. The Opinion Evidence

Consultative examiner, Dr. David Hunt, prepared an internal
medicine consultation dated August 5, 2022. (AR 1019-22). Dr. Hunt
reviewed no medical records. (AR 1021). Dr. Hunt did review a
cervical spine x-ray showing minimal degenerative disease, and a
limited lumbar spine x-ray that was normal. (AR 1018). Plaintiff

17

complained of neck and back pain and diabetic polyneuropathy. (AR 1019). On examination, he was able to generate only 20 pounds of force with his right hand and zero pounds of force with his left, he had normal gait and balance and did not require an assistive device for ambulation, he had minimal back tenderness and some limited range of motion, his sensation was intact, and he had normal muscle bulk and tone and strength of 5/5 in his extremities. (AR 1020-21). Dr. Hunt diagnosed, inter alia, diabetic polyneuropathy and cervical and lumbar disc disease, and opined that Plaintiff would be capable of medium work with frequent pushing and pulling, frequent postural movements and activities requiring agility, and no manipulative limitations or need for an assistive device. (AR 1022).

State agency physicians reviewed the record in September of 2022, and February 2023, and found Plaintiff capable of a range of medium work with frequent climbing of ramps and stairs, frequent stooping, kneeling, crouching and crawling, occasional climbing of ladders ropes and scaffolds, and no concentrated exposure to hazards. (AR 60-141). The state agency physicians expressly considered Plaintiff's shoulder MRIs showing mild to moderate issues, and Plaintiff's reduced grip strength noted in Dr. Hunt's consultative examination, but found that Plaintiff would have no manipulative limitations. (AR 66-67, 74, 85-87, 92, 107-08, 113-14, 127-28, 133-34). They reasoned that Plaintiff's decreased grip strength was likely secondary to poor effort (not noted by Dr. Hunt). (AR 75, 94, 115, 135). The state agency physician noted, on reconsideration review that, there was no evidence of myopathy,

18

radiculopathy, or sensory polyneuropathy, no evidence of isolated nerve injury, and Plaintiff's light sensation was intact at his consultative examination. (AR 108, 128). The state agency physicians also noted that Plaintiff had an antalgic gait and was using a cane at one appointment in February 2020 (and did not mention any other appointments), but did not find that Plaintiff would not need an assistive device. (AR 68, 72-75, 86, 91-94, 107, 112-15, 127, 132-35).

**B.    The ALJ Failed to Provide Legally Sufficient Reasons for Discounting Plaintiff's Testimony and Statements About His Physical Limitations**

Plaintiff argues that the ALJ erred in determining his RFC by failing to provide legally sufficient reasons for discounting his testimony and statements suggesting greater limitations from physical impairments. Specifically, Plaintiff argues that the ALJ relied solely on a lack of supporting objective medical findings to support greater RFC restrictions, and relied on only a small portion of the medical evidence in so finding. See Pl. Brief at 2-10; Pl. Reply at 1-5. The Court agrees.

**1.    Plaintiff's Statements**

Plaintiff testified that he lived with his mother, and his two children who were then between 9 and 13 years old. (AR 41). He said he stopped working in 2018 because he developed diabetic neuropathy and his hands started cramping severely which made it

19

hard to use them. (AR 43, 51). He would drop things. (AR 52). He
said he was unable to work because he is in a lot of pain in his
neck, back, shoulders, legs and ankles, it is hard for him to move
around, and he gets dizzy because he cannot control his diabetes.
(AR 46, 48). Plaintiff said he could not drive because it is hard
for him to move his neck to change lanes and it is hard to sit in
a car. (AR 41-42). He spent about 16 hours a day in bed, tried to
talk to his kids and help them with their homework, dressed himself,
and cared for his personal needs. (AR 48-49). His mother did all
the housework. (AR 48-49).

Plaintiff said he could lift only one pound due to his neck
injury, spasms in his right arm, and lack of strength in his hands.
(AR 49-50). He could sit for 10 minutes, walk for 55 feet, and
needed to use a cane - which was prescribed by his primary doctor
when he had his 2019 car accident - while walking for balance. (AR
46, 50-51).

In a Function Report form dated June 9, 2022, Plaintiff
reported that he has a hard time standing, walking, bending, and
lifting for long periods of time. (AR 318). He spent his days
checking his blood sugar, eating breakfast, reading books, watching
television for 10 hours, and showering. (AR 319, 322). He could
manage his personal care but could not move fast bending to dress
himself because he gets dizzy. (AR 319). He did no household work
apart from making his bed with help. (AR 320). He stated that "it
hurts [him] to move." (Id.). He could go outside every day for
sunshine and fresh air and ride in a car, but he could not go out

alone due to anxiety, dizziness, difficulty walking, communicating, and standing. (AR 321-22). He did not drive because he was scared after his 2019 car accident. (AR 321). He reported that he could not stand people—he only put up with his immediate family. (AR 322). He could not lift, squat, bend, stand, reach, walk kneel, or use his hands for a long period of time due to dizziness. (AR 323). He also had a hard time seeing, talking, and understanding. (Id.). He estimated that he could walk twenty feet before needing to rest for three minutes, pay attention for two minutes, and that he did not finish what he started, did not follow instructions well, did not handle change well, and is paranoid being around people. (AR 323-24). He used a cane, wheelchair, and glasses daily. (AR 324). His medications caused him to be disoriented, confused, dizzy, drowsy, have blurred vision, mood changes, trouble concentrating, trouble sleeping, anxiety, headaches, weakness, anger, and aggression. (AR 325).[10]

---

[10]    In a third-party Function Report form dated May 31, 2022, Plaintiff's significant other reported that she helped Plaintiff take his medications, and prepared his meals. (AR 285-92). She stated that Plaintiff had burns to his arms that caused a lot of nerve damage, severe dizzy spells that cause him to lose his balance "alot," and diabetes, shoulder and back injuries. (AR 285). She reported the same daily activities reported by Plaintiff, but noted that Plaintiff watches his children while they are home from school, and drives but not "much often due to his illness." (AR 286-89). She reported that: (1) Plaintiff has difficulty lifting due to pain in his arms; (2) squatting, bending and standing cause dizziness; (3) reaching affects his shoulders; (4) walking causes dizziness; (5) diabetes affects his vision; and (6) he had a hard time completing tasks or understanding. (AR 290).  She estimated that Plaintiff could walk less than half a mile before needing to rest for up to an hour. (Id.). She indicated that Plaintiff uses a walker, cane, brace/splint, and glasses, but did not indicate that

In Disability Report – Appeal forms, Plaintiff reported that his mobility and fatigue had worsened, and that if he sits or stands for long periods of time, his legs feel numb and start shaking, and that he could walk about 25 feet before running out of air and having pain. (AR 328-35, 347-54). He reported that he had stopped doing activities with his children. (AR 352).

### 2.    **Applicable Law**

An RFC assessment requires the ALJ to consider a claimant's impairments and any related symptoms that may "cause physical and mental limitations that affect what [he] can do in a work setting." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). In determining a claimant's RFC, the ALJ considers all relevant evidence, including a claimant's statements and residual functional capacity assessments made by consultative examiners, state agency physicians, and medical experts. 20 C.F.R. §§ 404.1513, 404.1545(a)(3), 416.913, 416.945(a)(3).

When assessing a claimant's credibility regarding subjective pain or intensity of symptoms, the ALJ must engage in a two-step analysis. Trevizo v. Berryhill, 871 F.3d 664, 678 (9th Cir. 2017). First, the ALJ must determine if there is medical evidence of an impairment that could reasonably produce the symptoms alleged. Garrison, 759 F.3d at 1014. "In this analysis, the claimant is <u>not</u>

---

he uses a wheelchair. (AR 291).  She reported that his medications cause him to be dizzy, anxious, drowsy, and have mood swings. (AR 292).

required to show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom." Id. (emphasis in original) (citation omitted). "Nor must a claimant produce objective medical evidence of the pain or fatigue itself, or the severity thereof." Id. (citation omitted).

If the claimant satisfies this first step, and there is no evidence of malingering, the ALJ must provide specific, clear and convincing reasons for rejecting the claimant's testimony about the symptom severity. Id. at 1014-15; see also Robbins, 466 F.3d at 883 ("[U]nless an ALJ makes a finding of malingering based on affirmative evidence thereof, he or she may only find an applicant not credible by making specific findings as to credibility and stating clear and convincing reasons for each."). "This is not an easy requirement to meet: The clear and convincing standard is the most demanding required in Social Security cases." Garrison, 759 F.3d at 1015 (citation omitted). The ALJ must evaluate "the intensity and persistence of those symptoms to determine the extent to which the symptoms limit [the claimant's] ability to perform work-related activities for an adult." Soc. Sec. Ruling ("SSR") 16-3p, 2017 WL 5180304, at *3.

While the ALJ cannot "delve into wide-ranging scrutiny of the claimant's character and apparent truthfulness," Trevizo, 871 F.3d at 678 n.5, the ALJ may consider "prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; unexplained or inadequately explained

failure to seek treatment or to follow a prescribed course of treatment; and the claimant's daily activities." Ghanim v. Colvin, 763 F.3d 1154, 1163 (9th Cir. 2014) (citation omitted). Inconsistencies between a claimant's testimony and conduct, or internal contradictions in the claimant's testimony, also may be relevant. Burrell v. Colvin, 775 F.3d 1133, 1137 (9th Cir. 2014).

In addition, the ALJ may consider the observations of treating and examining physicians regarding, among other matters, the functional restrictions caused by the claimant's symptoms. Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996); accord Burrell, 775 F.3d at 1137. However, it is improper for an ALJ to reject subjective testimony based "solely on a lack of objective medical evidence to fully corroborate the claimant's allegations." Bray v. Comm'r of Soc. Sec. Admin., 554 F.3d 1219, 1227 (9th Cir. 2009) (citation omitted); see also Smartt v. Kijakazi, 53 F.4th 489, 498 (9th Cir. 2022) (reaffirming same but observing that inconsistency with the medical evidence is a factor that can be considered; "When objective medical evidence in the record is inconsistent with the claimant's subjective testimony, the ALJ may indeed weigh it as undercutting such testimony.") (emphasis original); SSR 16-3p, 2017 WL 5180304, at *5 ("Objective medical evidence is a useful indicator to help make reasonable conclusions about the intensity and persistence of symptoms, including the effects those symptoms may have on the ability to perform work-related activities. . .").

The ALJ must make a credibility determination with findings that are "sufficiently specific to permit the court to conclude

24

that the ALJ did not arbitrarily discredit claimant's testimony." Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008) (citation omitted); see Brown-Hunter v. Colvin, 806 F.3d 487, 493 (9th Cir. 2015) ("A finding that a claimant's testimony is not credible must be sufficiently specific to allow a reviewing court to conclude the adjudicator rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit a claimant's testimony regarding pain." (citation omitted). Although an ALJ's interpretation of a claimant's testimony may not be the only reasonable one, if it is supported by substantial evidence, "it is not [the court's] role to second-guess it." Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001).

### 3.    The ALJ's Evaluation of the Subjective Statements

In determining Plaintiff's RFC, the ALJ summarized Plaintiff's subjective statements and testimony, and found that Plaintiff's "medically determinable impairments reasonably might be expected to cause the alleged symptoms[,]" but his "statements concerning the intensity, persistence and limiting effects of these symptoms" were "not entirely consistent with the medical evidence and other evidence in the record." (AR 23-24).

The ALJ then discussed the medical record as follows: Plaintiff had a visit on the June 5, 2018, alleged onset date, where he complained of cramping and numbness in the hands and feet, but had only obesity noted on examination. (AR 24 (citing AR 380)). There was little evidence of medical care after this visit until

Plaintiff's car accident in August 2019, when he was hospitalized for two weeks to treat his injuries. (Id. (citing AR 562)). After the accident, Plaintiff began complaining of dizziness, imbalance, headaches, nausea, and difficulty lifting objects, reporting frequent use of a cane, but his problems improved with fewer residual symptoms being reported over time. See Id. (citing AR 695 (January 2020 note for cardiology consultation, where Plaintiff was observed to have an unsteady gait for which he needed a cane, and was not yet eligible for physical therapy due to thoracic and lumbar fractures from his accident); AR 708 (March 2020 note reporting multiple symptoms since Plaintiff's car accident, where Plaintiff was using a wheelchair and was stiff and unsteady); AR 973 (July 2021 note for follow up after shoulder MRI where Plaintiff reported his balance had only slightly improved since the last year and that he had a recent fall due to his balance issues)). The ALJ found that Plaintiff had a "reduced need for ongoing care" throughout 2022, and spine "imaging" revealed "minimal" degenerative disc disease at C5-C6, and a normal lumbar spine. See Id.(citing AR 1018 (August 2022 spine x-rays Dr. Hunt reviewed)). The ALJ noted that Dr. Hunt reported that Plaintiff had normal gait and balance without the use of an assistive device, and normal muscle strength except in the left hand. Id. (citing AR 1021 (reporting normal strength except for grip strength)). While Plaintiff recently complained of shortness of breath, feeling winded after talking too much, and wheezing, his examination at the time of the visit reported no evidence of audible wheezing and that Plaintiff was able to speak in clear full sentences. See Id. (citing AR 1191-92 (April 2023 note for telephone visit reporting

that it was difficult to diagnose the cause of Plaintiff's symptoms via a phone visit, and referring Plaintiff to a pulmonologist)). The ALJ noted that the most recent evidence reported "very minimal" ground glass interstitial changes in the middle lobe, and subjective complaints of neuropathy and numbness in Plaintiff's hands, but physical examination findings remained normal, and the record confirmed that Plaintiff was able to drive. See AR 24-25 (citing AR 1174-75 (February 2024 note for lab test follow up visit reflecting the same except Plaintiff reported that he has pain and tingling when he "tries to" drive) (emphasis added)).

The ALJ adopted a more limited RFC than all the medical opinions in the record had found, explaining:

> Ultimately, considering the established physical impairments and the consistent complaints of the claimant I find these in combination warrant limiting assigned work to the exertional level of light with additional nonexertional postural limitations which accommodate the mild degenerative changes in the spine and then considering the exacerbating effects of obesity, the assigned work should not involve working around unprotected heights and considering the reports of dizziness due to vertigo there should be no assigned work around hazards and moving dangerous machinery.

\* \* \*

27

Based on the foregoing, I find the residual functional
capacity as assessed for the Claimant in this decision
is supported by the totality of the evidence. While the
Claimant alleged significant limitations affecting a
wide range of functioning and considering the claimant's
clinical presentation and the minimal findings on upon
examination, I find the reported pain and symptoms not
entirely consistent with the claimant's subjective
complaints and reports of pain and symptoms. The
Claimant's complaints and reports of pain and symptoms
throughout this record are consistent and when these are
considered in combination with the limitations resulting
from the established impairments, the Claimant certainly
would not be able to return to their past relevant work.
However, the objective findings upon examination
throughout this record fully support finding the claimant
retains sufficient residual functional capacity to
engage in less demanding work at the light exertional
level with additional nonexertional limitations as
incorporated into the residual functional capacity in
this decision. The residual functional capacity as
assessed for the Claimant in this decision fully
accommodates both for the limitations resulting from the
established impairment and the Claimant's reported pain
and symptoms and the residual functional capacity as
assessed in this decision incorporated specific
protections to address symptoms due to vertigo.

1  (AR 25).

2

3      **4.  Analysis**

4

5      The ALJ's reasoning in this case is not sufficiently specific

6  for the Court to conclude that the ALJ rejected Plaintiff's

7  testimony and statements suggesting greater physical limitations

8  on permissible grounds. Brown-Hunter v. Colvin, 806 F.3d at 493.

9  The ALJ appears to have relied solely on a lack of supporting

10  medical evidence which the ALJ could not do, Smartt, 53 F.4th at

11  498; Bray, 554 F.3d at 1227, and the ALJ's characterization of the

12  evidence does not include significant findings in the record. In

13  particular, the ALJ did not acknowledge the observations in the

14  record (discussed above) that Plaintiff had ongoing balance issues

15  and was a fall risk, or that Plaintiff had any shoulder impairments.

16

17      Defendant asserts that the ALJ also relied on asserted

18  inconsistencies between what Plaintiff reported and the medical

19  record, and a lack of consistent treatment commensurate with

20  Plaintiff's complaints. See Def. Brief at 4-5. This Court is

21  constrained to consider only the reasoning the ALJ actually

22  provided. See Brown-Hunter v. Colvin, 806 F.3d at 494 (court is

23  constrained to review only the reasons the ALJ specifically

24  identified); cf. Pinto v. Massanari, 249 F.3d 840, 847 (9th Cir.

25  2001) (the court "cannot affirm the decision of an agency on a

26  ground that the agency did not invoke in making its decision");

27  see also Connett v. Barnhart, 340 F.3d 871, 874 (9th Cir. 2003)

28  (reversing district court's decision where the district court had

affirmed on the basis of reasons supported by the record but unstated by the ALJ). Although the ALJ did not cite specifically a lack of consistent treatment commensurate with Plaintiff's complaints as a reason to discount his statements, this would not have been particularly convincing, given the ALJ's failure to cite or discuss Plaintiff's consistent monthly pain management treatment for almost a four-year period during which he was prescribed Norco for his pain.

While the ALJ generally (and confusingly) referred Plaintiff's "reported pain and symptoms" as "not entirely consistent with [Plaintiff's] subjective complaints and reports of pain and symptoms" (see AR 26), the ALJ did not identify any specific inconsistencies on which to discount Plaintiff's statements and testimony. (AR 23-26). The only possible inconsistency between Plaintiff's testimony and statements about his limitations and the evidence that the ALJ mentioned with any specificity was Plaintiff's reported normal gait and balance at his consultative examination without the use of an assistive device, and Plaintiff's testimony that he must use a cane to walk due to balance issues. See AR 24 (citing AR 1021). However, this reference, alone, is not a clear and convincing reason for rejecting Plaintiff's testimony in its entirety, especially in light of the record suggesting that, whether or not Plaintiff may require the use of an assistive device, he has ongoing balance issues and other limitations with varying degrees of support in the record.

The Court notes that Plaintiff's argument that the ALJ erred by failing to consider a purported "medical opinion" from nurse practitioner Ashley Morello is not well taken. See Pl. Brief at 10-12; Pl. Reply at 5-6. Ms. Morello provided an "Application for Disabled Person Placard or Plates" for Plaintiff dated November 17, 2023, indicating that Plaintiff was eligible for a temporary placard for six months (until May 17, 2024), based on: (1) "A diagnosed disease or disorder which substantially impairs or interferes with mobility," and (2) "A significant limitation in the use of lower extremities," due to "cervical cord compression with myelopathy[,] and lumbar radiculopathy causing severe pain when walking." (AR 360-61). Under applicable regulations, such an indication is not a "medical opinion" the ALJ was required expressly to consider. See 20 C.F.R. §§ 404.1513(a)(2), 416.913(a)(2) (defining a "medical opinion" as a statement about what a claimant can still do despite impairments).

For the foregoing reasons, the Court finds the ALJ failed to adequately consider Plaintiff's subjective testimony and complaints regarding his physical impairments.

## C.   **Remand Is Warranted**

The decision whether to remand for further proceedings or order an immediate award of benefits is within the district court's discretion. Harman v. Apfel, 211 F.3d 1172, 1175-78 (9th Cir. 2000). Where no useful purpose would be served by further administrative proceedings, or where the record has been fully

developed, it is appropriate to exercise this discretion to direct an immediate award of benefits. <u>Id.</u> at 1179 ("[T]he decision of whether to remand for further proceedings turns upon the likely utility of such proceedings."). However, where, as here, the circumstances of the case suggest that further administrative review could remedy the Commissioner's errors, remand is appropriate. <u>McLeod v. Astrue</u>, 640 F.3d 881, 888 (9th Cir. 2011); <u>Harman</u>, 211 F.3d at 1179-81.

Since the ALJ failed to properly assess Plaintiff's testimony and statements regarding his physical impairments in the context of the medical record as a whole, remand is appropriate.

//

//

//

32

1

**ORDER**

2

3      For the foregoing reasons,[11] the decision of the Commissioner

4 is reversed, and the matter is remanded for further proceedings

5 pursuant to Sentence 4 of 42 U.S.C. § 405(g).

6

7      LET JUDGMENT BE ENTERED ACCORDINGLY.

8

9 Dated: November 21, 2025

10

11                                    _____/s/_____

12                                         ALKA SAGAR
                                    UNITED STATES MAGISTRATE JUDGE

13

14

15

16

17

18

19

20

21

22

23

24      _____

25      [11]     The Court has not reached any other issue raised by
Plaintiff except to determine that reversal with a directive for
26 the immediate payment of benefits would not be appropriate at this
time.

27

28